## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HAJUR EL-HAGGAN<br>453 New Jersey Ave. SE<br>Washington, D.C. 20003,<br>Howard County;<br><br>ANIKE ROBINSON,<br>453 New Jersey Ave. SE<br>Washington, D.C. 20003,<br>Montgomery County;<br><br>ANGELA WOLF,<br>453 New Jersey Ave. SE<br>Washington, D.C. 20003,<br>Prince George's County;<br><br>     *Plaintiffs,*<br><br>v.<br><br>BOARD OF EDUCATION FOR<br>MONTGOMERY COUNTY,<br>4910 Macon Rd.<br>Rockville, MD 20852;<br><br>ACTING SUPERINTENDENT AND<br>FORMER CHIEF OPERATING<br>OFFICER, BRIAN HULL, in his<br>individual and official capacity,<br>850 Hungerford Dr.<br>Rockville, MD 20850;<br><br>ASSOCIATE SUPERINTENDENT,<br>PETER MORAN, in his individual<br>capacity,<br>850 Hungerford Dr.<br>Rockville, MD 20850;<br><br>CHIEF OF HUMAN RESOURCES AND<br>DEVELOPMENT, APRIL L. KEY, in her<br>individual capacity,<br>850 Hungerford Dr.<br>Rockville, MD 20850; | **Case No.:**<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**Hon. Judge** |

ACTING DIRECTOR OF
COMPLIANCE AND
INVESTIGATIONS, STACEY T.
ORMSBY, in her individual capacity,
850 Hungerford Dr.
Rockville, MD 20850;

DIRECTOR II OF OFFICE OF SCHOOL
SUPPORT AND WELL-BEING, SEAN
P. MCGEE, in his individual capacity,
850 Hungerford Dr.
Rockville, MD 20850;

DIRECTOR OF OFFICE OF SCHOOL
SUPPORT AND WELL-BEING, DAVID
T. CHIA, in his individual capacity,
850 Hungerford Dr.
Rockville, MD 20850;

DIRECTOR OF STUDENT WELFARE
AND COMPLIANCE UNIT, GREGORY
S. EDMUNDSON, in his individual
capacity,
850 Hungerford Dr.
Rockville, MD 20850;

PRINCIPAL OF WESTLAND MIDDLE
SCHOOL ALISON SERINO, in her
individual capacity,
5511 Massachusetts Ave.
Bethesda, MD 20816; and

PRINCIPAL OF TAKOMA PARK
MIDDLE SCHOOL, ERIN MARTIN, in
her individual capacity,
7611 Piney Branch Rd.
Silver Springs, MD 20910

       *Defendants.*

## **COMPLAINT**

Plaintiffs Hajur El-Haggan, Anike Robinson, and Angela Wolf, three Montgomery County Public School teachers (herein after "MCPS"), bring this lawsuit under the First Amendment and Title VII and state as follows:

## INTRODUCTION

1.   This lawsuit challenges MCPS's decision to punish three teachers because they support Palestine and criticize Israel.

2.   Like many people of conscience, Hajur El-Haggan, Anike Robinson, and Angela Wolf have expressed their views—to their friends, families, and communities—about Palestine, Israel, and the violence in Gaza and the West Bank.

3.   But unlike some of their colleagues who express support for Israel or justify violence against Palestinians, MCPS officials removed the teachers from their classrooms.

4.   In suspending Plaintiffs because of their views, MCPS officials commit a grave First Amendment violation.

5.   MCPS officials did not suspend Plaintiffs because of *how* they expressed their views Rather, Defendants suspended these three teachers *because* of their views.

6.   Indeed, the teachers expressed themselves in the same ways they and their colleagues had about other topics. Whether online or in school, teachers have long been allowed to express their views on a range of public topics—from racial justice to the war in Ukraine—as the First Amendment requires. But through these suspensions, the Board of Education and MCPS are pursuing an illegal, Israel-specific, viewpoint-suppression policy it has not adopted for any other matter of public concern.

7.   By removing three teachers from their classrooms, the Board of Education and MCPS officials have prioritized their ideological quest to eliminate a common viewpoint—for a

ceasefire, for peace to Palestinians and Israelis alike, and for aid to those who need it—from the ranks of their teachers.

## PARTIES

8.   Plaintiffs Hajur El-Haggan, Anike Robinson, and Angela Wolf are teachers who are employed with Montgomery County Public Schools in Maryland. Venue is proper because the plaintiffs reside within this district and because a substantial part of the events or omissions giving rise to their claims occurred within this district.

9.   Defendant Board of Education for Montgomery County (hereinafter "MCBOE," "the Board," or "the Board of Education") is the body politic and corporate which may sue and be sued. Md. Code, ED§ 3-104; *See also Miller v. Montgomery Cnty. Pub. Sch.*, 2020 WL 2097686 (D.Md., 2020). The Board of Education retains full rights, authority, and responsibility to control, supervise, and manage MCPS, where all three plaintiffs are employed at Argyle Middle School, Westland Middle School, and Takoma Park Middle School respectively.

10. Defendant Brian Hull is the Acting Superintendent of Montgomery County Public Schools. He has the authority to promulgate MCPS and the Board's policies. Upon information and belief, he made the decision to suspend plaintiffs. He is being sued in his individual and official capacity.

11. Defendant Peter Moran is the Associate Superintendent of Montgomery County Public Schools. He has the authority to promulgate MCPS and the Board's policies. Upon information and belief, he made the decision to suspend Ms. Wolf. He is being sued in his individual capacity.

12. Defendant April L. Key is the Chief of Human Resources and Development. She has the authority to promulgate MCPS and the Board's policies. Upon information and belief, she made the decision to suspend plaintiffs. She is being sued in her individual capacity.

13. Defendant Stacey T. Ormsby is the Acting Director of Compliance and Investigations at Montgomery County Public Schools. She has the authority to promulgate MCPS and the Board's' policies. Upon information and belief, she made the decision to suspend plaintiffs. She is being sued in her individual capacity.

14. Defendant Sean P. McGee is a Director for the Office of School Support and Well-Being. He has the authority to promulgate MCPS and the Board's policies. Upon information and belief, he made the decision to suspend Plaintiff Angela Wolf. He is being sued in his individual capacity.

15. Defendant David T. Chia is the Director for the Office of School Support and Well-Being. He has the authority to promulgate MCPS and the Board's policies. Upon information and belief, he made the decision to suspend Plaintiff Anike Robinson. He is being sued in his individual capacity.

16. Defendant Gregory S. Edmundson is the Director of the Student Welfare and Compliance Unit. He has the authority to promulgate MCPS and the Board's policies. Upon information and belief, he made the decision to suspend Plaintiff Angela Wolf. He is being sued in his individual capacity.

17. Defendant Alison Serino is the Principal of Westland Middle School. She has the authority to promulgate MCPS and the Board's policies. Upon information and belief, she made the decision to suspend Plaintiff Anike Robinson. She is being sued in her individual capacity.

18. Defendant Erin Martin is the Principal of Takoma Park Middle School. She has the authority to promulgate MCPS and the Board's policies. Upon information and belief, she made the decision to suspend Plaintiff Angela Wolf. She is being sued in her individual capacity.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 1343 because this action arises under the First and Fourteenth Amendments to the United States Constitution.

20. This Court has personal jurisdiction over Defendants because Defendants reside and conduct business in the District of Maryland.

21. Plaintiffs' claims for attorneys' fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-2(m), Md. Code, SG §20-1009, 42 U.S.C.§ 1988, and Fed. R. Civ. P. 54.

22. Venue in this district is proper pursuant to 28 U.S.C.§ 1391(b) and 1391(e).

## ADMINISTRATIVE HISTORY

23. Plaintiff Hajur El-Haggan timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") and the Maryland Commission on Civil Rights ("MCCR").

24. Plaintiff Hajur El-Haggan received a Notice of Right to Sue less than 90 days ago.

25. This Complaint is being timely filed within 90 days from the date Plaintiff received her Notice of Right to Sue letter from the EEOC.

26. Plaintiff Hajur El-Haggan has exhausted her administrative remedies as to her Title VII of the Civil Rights Act of 1964 claim and § 20-602 of the Annotated Code of Maryland.

## FACTUAL ALLEGATIONS

### Plaintiff Hajur El-Haggan

**Ms. El-Haggan is a highly qualified educator who is adored by her colleagues and students.**

27. Hajur El-Haggan is an Arab, Muslim educator.

28. MCPS hired Ms. El-Haggan in 2015 at Seven Locks Elementary School, where she taught for four years. After that, she transitioned to Argyle Middle School, where she currently teaches sixth and seventh grade math. However, over the course of her time at Argyle, she's also taught World Studies, English, Digital Literacy, and Science. Ms. El-Haggan also supervised several student clubs over the years, including the debate team, the creative writing collective, and the anime club.

29. Ms. El-Haggan's colleagues and students adore her. Colleagues have described her as an incredible teacher who has a unique connection with her students. Students feel at ease speaking to Ms. El-Haggan about issues they face. She encourages students to be themselves. She encourages curiosity and has filled her classroom with alternative seating, stuffed animals, and potted plants, all sourced with her own funds. Teachers have described her as a powerful reminder that women belong in STEM.

**Ms. El-Haggan's views regarding the crisis in Gaza are intrinsically tied to her identity as an Arab and Muslim woman.**

30. For Arabs and Muslims, Palestine has special significance.

31. Ms. El-Haggan, like many Muslims, believes that Al-Aqsa Mosque in Jerusalem is the third holiest site in Islam. The golden Dome of the Rock is recognizable to all Muslims from around the world, and praying at the site is considered a great privilege. According to Islamic belief, the Dome of the Rock contained the first *Qibla,* or direction towards which Muslims prayed. Al-Aqsa was also one of the earliest mosques, and historically, pilgrimages to the

Muslim holy sites of Mecca and Medina included a stopover at Al-Aqsa Mosque in Jerusalem.

32. Ms. El-Haggan, like other Arabs, sees Palestinians as belonging to the same ethnic group as she. This shared ancestry means that, when Israeli soldiers kill and maim Palestinians with an impunity she believes is based on decades of dehumanizing Arab lives, it affects her as an Arab.

33. In 2000, for example, Ms. El-Haggan joined other Muslims and Arabs around the country to protest the Israeli government's killing of 12-year-old Mohammed al-Durra and his father in the Gaza Strip.[1]

34. This protest, like many other organizing efforts in the Muslim and Arab communities, draws from the shared religion and ancestry between Muslims and Arabs in the United States and Palestinians overseas.

**Ms. El-Haggan is suspended and investigated for sharing pro-Palestine views.**

35. On October 13, 2023, following the start of intense bombardment of civilians in Gaza, Ms. El-Haggan started wearing shirts or sweatshirts with a variety of slogans including "Free Gaza" and "Free Palestine."

36. Ms. El-Haggan also wore homemade Palestine pins and buttons on her outfits every day – they included the slogan "Free Palestine" as well as illustrations of the Palestinian flag and watermelons[2]. Ms. El-Haggan also had a large Palestinian flag on her car's windshield with the text "Free Palestine."

---

[1] *Palestinian Children moved by boy's killing*, CNN, Oct. 9, 2000.
https://edition.cnn.com/2000/WORLD/meast/10/09/palestinian.children.reut/.

[2] *See* Armani Syed, *How the Watermelon Became a Symbol of Palestinian Solidarity*, TIME, Oct 20, 2023.
https://time.com/6326312/watermelon-palestinian-symbol-solidarity/. ("The watermelon became a symbol for Palestinian solidarity. It first emerged after the Six-Day War in 1967, when Israel seized control of the West Bank

37. Like Ms. El-Haggan, other MCPS employees expressed opinions about various political and social matters – such as Black Lives Matter ("BLM"), Pride, and Ukraine. Teachers wore pins and clothing that expressed their views. Indeed, Ms. El-Haggan herself also had regularly worn clothing and pins which expressed her support for other social causes, such as BLM.

38. Ms. El-Haggan also added a slogan calling for everyone to be free in Palestine and Israel to her staff email signature: "From the river to the sea, Palestine will be free."

39. To Ms. El-Haggan, this slogan is an aspirational call to freedom and dignity for the Palestinian people, who have lived under violently oppressive circumstances for over 75 years, and everyone else living there. It is a call for everyone to have a right to exist and move freely within the land between the Jordan River and the Mediterranean Sea, and to be free from religious and social discrimination. It is particularly significant to Ms. El-Haggan who has loved ones in Palestine and whose childhood friend was recently killed as a result of the Israeli airstrikes in Gaza.

40. She added that quote on the email that county staff use to communicate internally with each other. This was not the email she used to communicate with students or parents- no student or parent ever saw this email signature.

41. Other MCPS teachers also included slogans and quotes related to political and social causes in their email signatures. One teacher had the slogan "Black Lives Matter" in her email signature. Another shared that they were a "Rainbow Alliance Sponsor" of the LGBTQ club. Several teachers had links to articles about using pronouns in signatures.

---

and Gaza, and annexed East Jerusalem. At the time, the Israeli government made public displays of the Palestinian flag a criminal offense in Gaza and the West Bank. To circumvent the ban, Palestinians began using the watermelon, because, when cut open the fruit bears the national colors of the Palestinian flag – red, black, white, and green.")

42. Although Ms. El-Haggan and other teachers had long been allowed to include political and social messages in their email signatures, MCPS administrators treated Ms. El-Haggan's political messages differently. Because of the viewpoint of those political messages, MCPS officials invoked a dormant policy restricting what an employee can include in their email signature to punish Ms. El Haggan.

43. On November 15, according to the final investigative report, a staff member at the school attempted to set up a training with Ms. El-Haggan for a student in her class with a medical condition. The staff member became upset when she read Ms. El-Haggan's signature block.

44. On November 17, Ms. El-Haggan was targeted on school property. Her car's Palestinian flag was slashed, and the passenger side mirror was pushed in.

45. On November 18, according to the investigative report, the staff member sent a screenshot of Ms. El-Haggan's signature line to her DHHS supervisor, Deborah Bitonti. The screenshot was also circulated to the head of school health services.

46. On November 20, Ms. El-Haggan reported the November 17 hate incident to Montgomery County police.

47. That same morning, according to the investigative report, the staff member complained to Assistant Principal Hannah Turner about Ms. El-Haggan's signature block. Assistant Principal Turner told the staff member that both she (the staff member) and Ms. El-Haggan were very passionate about their beliefs and suggested they discuss the matter in a restorative justice meeting. The staff member refused.

48. Later that same day that Ms. El-Haggan filed the police report, Principal James Allrich of Argyle Middle School met with Ms. El-Haggan and informed her that she was being placed on administrative leave because of her email signature.

49. Upon information and belief, Stacey Ormsby and April Key made the decision to suspend Ms. El-Haggan.

50. Ms. El-Haggan feared further repercussions for her speech, so she removed the Palestinian freedom slogan from her email signature soon after her suspension.

51. According to the investigative report, Principal Allrich received an email from a parent complaining about Ms. El-Haggan's clothing. According to the report, they described Ms. El-Haggan as wearing more than a dozen "Free Palestine" pins, buttons, and stickers and a headscarf that read "From the River to the Sea." They accused Ms. El-Haggan of promoting genocide.

**MPCS' investigation of Ms. El-Haggan was biased, deviated from MCPS' typical investigations, and carried out in a way to secure Ms. El-Haggan's termination.**

52. On December 12, during Ms. El-Haggan's suspension, investigators interviewed the staff member. According to the investigative report, the staff member accused Ms. El-Haggan of promoting genocide through her email signature block.

53. Further according to the report, the staff member complained about Ms. El-Haggan's clothing, including a "Free Palestine" shirt, a hijab that resembled the colors of the Palestinian flag, and various buttons on a lanyard that read "I stand with Palestine." According to the report, the staff member no longer felt comfortable training Ms. El-Haggan.

54. Ms. El-Haggan and her attorneys attended a mandatory, virtual investigative meeting on December 22. Present were Director Ormsbey and Investigator Oscar Giron.

55. Throughout its investigative process, MCPS officials treated Ms. El-Haggan differently than it had other teachers it had investigated for other matters. For example, Stacy Ormsby refused Ms. El-Haggan the right to reschedule her interview to accommodate the attendance of her attorneys, attempted to coerce her into attending the interview without her attorneys, and initially refused to provide her with the breaks she requested during questioning. Furthermore, Director Ormsbey only attended Ms. El-Haggan's interview, and not the investigative interview for the other plaintiffs, who are notably both non-Arab and non-Muslim.

56. During the investigative meeting, Director Ormsbey and Investigator Giron asked Ms. El-Haggan accusatory, biased, and harassing questions including but not limited to: (i) asking about her hijab and what it looked like during parent-teacher conferences; (ii) asking if Ms. El-Haggan was promoting "genocide"; (iii) asking if Ms. El-Haggan was aware that the Argyle Middle School staff member was Jewish- Ms. El-Haggan was not aware; and (iv) asking if Ms. El-Haggan read mainstream newspapers or watched mainstream news.

57. Director Ormsby and Investigator Giron asked Ms. El-Haggan about the phrase in her email signature block. She explained that "From the River to the Sea" is a basic call for freedom and equality for everyone between the Jordan River and the Mediterranean Sea. She also explained that Israel had killed her childhood friend in Gaza.

58. Ms. El-Haggan was confused about why the investigators questioned whether she was promoting genocide. By that time, the world was aware of the human rights abuses occurring in Gaza. By December 22, reports surfaced that Israel had killed more than 20,000 Palestinians. Ms. El-Haggan was certainly aware that a genocide was likely taking place, and

she was advocating that the international community put a stop to the genocide taking place against Palestinians.

59. They questioned her about whether she speaks about Palestine in the classroom. She explained that she does not – but if a student asks about her pins or requests one from her, she tells the student to go speak to their parent and request permission to take a pin.

60. When Ms. El-Haggan tried to compare her use of the slogan regarding Palestine with her and her colleagues' use of the BLM slogan, Director Ormsbey accused her of conflating the Pro-Palestine movement with BLM. Neither Director Ormsbey nor investigator Giron seemed willing or interested in hearing Ms. El-Haggan explain what the slogan meant to her and her community, and debated her each time she expressed herself. It was an aberrational deviation from typical investigations of MCPS teachers.

61. Ms. El-Haggan left the interview feeling attacked, harassed, and humiliated.

62. On January 29, 2024, hours before Ms. El-Haggan's *Loudermill* hearing, Director Ormsby emailed Ms. El-Haggan a copy of the investigative report and charges sustained against her.

63. The charges included were based on factual mistakes and twisted interpretations of Ms. El-Haggan's actions. MCPS applied its policies so as to exclude any kind of pro-Palestine message from its buildings.

64. In the investigative report, Ms. El-Haggan is accused of violating the *MCPS Employee Code of Conduct*, *MCPS Best Practices for Email,* and *MCPS Regulation KEA-RA,* which prohibits the distribution of campaign materials.

65. Ms. El-Haggan did not distribute materials for any political campaign, making this accusation factually wrong.

13

66. She is also accused of violating MCPS' nondiscrimination policy by promoting hate because she wore and distributed pro-Palestine pins and because of her email signature block.

67. This accusation was also factually wrong.  because Ms. El-Haggan was advocating for a ceasefire, peace, and a political solution that would provide Palestinians and Israelis dignity and security.

68. The investigative report omitted information and documentation that Ms. El-Haggan and her witnesses provided to investigators, including but not limited to numerous letters of support.

69. During the *Loudermill* hearing, present on behalf of the County were Ms. April Key, Chief of Human Resources and Development, Ms. Stephanie Williams, MCPS's General Counsel, and Mr. Roger Thomas, the Superintendent's assigned designee.

70. At the hearing, Ms. El-Haggan read a prepared statement which responded to each charge that was brought against her in the *Loudermill* notice letter. She gave the parties present a copy of her statement.

71. Notably, one of the charges brought against her, specifically that she violated MCPS's *Social Media Best Practices for Employees*, was not actually a charge for which Ms. El-Haggan was even under investigation. She was never asked about her social media, and the first time she heard anything about a social media charge was in the *Loudermill* notice.

72. By singling out Ms. El-Haggan, an Arab Muslim woman, for her email signature and placing her on leave, MCPS, MCBOE, and all involved administrators have both violated Title VII of the Civil Rights Act and engaged in viewpoint discrimination in violation of the First Amendment.

73. To date, Ms. El-Haggan remains suspended.

14

### Plaintiff Anike Robinson

**MCPS suspended Ms. Robinson, a qualified and beloved teacher who used her personal social media accounts to oppose the genocide in Gaza.**

74. Anike Robinson is a teacher at Westland Middle School and has been employed there since July 1, 2021.

75. Ms. Robinson has been a teacher for 25 years. Throughout her career she has taught humanities, English, history, and art.

76. Ms. Robinson's colleagues have described her as someone who is beloved by many students and teaches in creative and empowering ways. She creates a classroom that is full of inspiring words and art and maintains an engaging thoughtful environment.

77. Ms. Robinson and her colleagues have expressed various opinions about different social and political causes, including Pride, abortion rights, the Iraq war, and Black Lives Matter.

78. As a matter of conscience, Ms. Robinson opposes what she views as an unfolding genocide in Gaza and speaks out against it.

79. Following the start of intense bombardment of civilians in Gaza, Ms. Robinson began posting content related to Palestine in her personal capacity on her private Facebook, Instagram and TikTok accounts.

80. Her posts supported Palestine, criticized Israel, and tactfully expressed commonly-held views about the crisis there.

81. On November 26, 2023, according to the investigative report, a parent of a 7th grade WMS student emailed the principal and assistant principal about a post that Ms. Robinson made on her personal Instagram account on November 2. It was an image of a red eye with a map of *Palestine* in the center and the caption: "*The world is watching, Palestine will be free.*"

The caption also read: "*colonized peoples across the world stand in solidarity with the Palestinian people against israel's settler colonial state-sanctioned apartheid program of genocide backed by u.s. imperialism from the river to the sea, palestine will be free. decolonization is not a metaphor.*"

82. On November 27, at the request of the principal, the same parent sent the school a photo Ms. Robinson shared which depicts an Israeli government missile, moments away from killing a Palestinian child. The caption read, "*Shame on the world. #plo #arafat #palestine #freepalestine #endapartheid.*" The photo was shared on Ms. Robinson's personal Instagram account.

83. Ms. Robinson posted the photo as a critique of the Israeli government's human rights abuses that it has and continues to carry out against Palestinians in Gaza and other occupied territories in Palestine. As of November 27, Israel had killed more than 14,000 Palestinians. 6,000 of those killed were children. To date, Israel's attacks on Gaza have killed nearly 27,500 Palestinians. Nearly 63,000 Palestinians have been wounded. Israel has attacked every single hospital in Gaza – Gazan journalist Bisan Owda reported that no hospital has surgical capacity. Gazans have resorted to eating animal feed due to starvation. Israel has also targeted journalist and their families.

84. On November 27, Principal Serino called Ms. Robinson into the office and told her that a family of a child she did not teach reported concerns regarding her private social media account.

85. Ms. Robinson explained the history of Palestine and her personal connection to the movement to Principal Serino. She explained that all of her posts express a desire for peace in the Middle East and for a ceasefire. She explained that what Israel was doing to Palestinians was a form of apartheid. She also provided Principal Serino with a list of books on

Palestine/Israel that she herself was assigned and read while a student at Montgomery County Public Schools.

86. Principal Serino gave Ms. Robinson a hug and said, "I'm not telling you what to do, I just want you to know."

87. Ms. Robinson feared that the school would discipline her for her speech on her personal social media accounts. As a result, she felt compelled to delete her TikTok Account. She did not delete her other social media accounts.

88. On December 1, according to the investigative report, a group of parents, only one of which had a student at WMS, complained about Ms. Robinson's personal social media. They said that her social media content, "casts Jews and Israelis in particular as perpetrators of apartheid, genocide, and blood-thirsty child-killing."

89. According to the report, one of the parents in particular sent administrators a list of posts on Ms. Robinson's personal social media accounts, which they took issue with, including: (a) a video on Ms. Robinson's Instagram account which supports the Starbucks boycott as part of the Boycott, Divestment, and Sanctions (BDS) movement; (b) a quote by Angela Davis; (c) a video of Cornel West in which he claims he loves his Jewish brothers, sisters, and siblings and stands with Palestine; (d) a meme criticizing the Israeli government; (e) a New York Times article about an incident with a pro-Israel teacher; (f) an image of a Palestinian man carrying a child; (g) a computer-generated photo depicting an Israeli missile moments away from killing a Palestinian child.

90. After speaking with Ms. Robinson, according to the investigative report, Principal Serino had a conversation with administrators in MCPS' central office in which they instructed her that anything that associates or depicts something bad with the Star of David

is antisemitic. Because the Star of David is on the Israeli flag, these instructions were understood by MCPS officials as directing them to prohibit criticism of one particular foreign country.

91. After receiving that instruction from the central office administrators, according to the report, Principal Serino submitted MCPS Form 226-5, Hate-Bias Incident Reporting Form.

92. On Monday December 4, according to the report, Principal Serino and one of the assistant principals met with Ms. Robinson in their office and provided her with a 24-hour suspension notice. Principal Serino said "I didn't know it was going to go this far, but it has." They did not provide Ms. Robinson with additional information.

93. On December 5, the Principal Serino made an announcement over the intercom and sent a letter to the WMS community stating that a staff member was on leave due to antisemitic social media posts that were being investigated.

94. Ms. Robinson returned the work the next day. As she began to enter her classroom, another teacher approached her and said, "You're not supposed to be here." He relayed to Ms. Robinson what occurred the day prior (the announcement and the letter). Ms. Robinson left the school in tears.

95. On her way home, she received a call from Principal Serino who explained that someone should have contacted Ms. Robinson and informed her that her suspension had been extended.

96. Later that afternoon, Ms. Robinson received a call and email from Director Stacy Ormsby. She told Ms. Robinson that she was suspended indefinitely. In addition, the terms of her suspension prohibit her from speaking to anyone within Montgomery County Public Schools, including the students who live in her neighborhood.

97. On December 15, the MCEA sent a letter to MCPS administration criticizing MCPS for their "abuse of power that demonstrates little regards for the employee's Constitutional rights and basic notions of fundamental fairness."[3]

**MCPS' investigation of Ms. Robinson focused on her personal social media posts.**

98. On December 19, according to the investigative report, investigation specialist Amy Cheesebrough interviewed a Jewish teacher, who described that she and Ms. Robinson had become friends over the last two years and worked closely together. The teacher explained that her husband was Israeli, and that Ms. Robinson had repeatedly reached out to her after October 7 to check on her mental well-being.

99. During Ms. Robinson's suspension, on December 21, the Jewish teacher reported to the school that Ms. Robinson was posting on her personal social media. So, MCPS officials monitored and documented Ms. Robinson's personal social media posts.

100.    MCPS officials documented posts that called for peace and a ceasefire, lawful activism, and articles and videos about the suffering of Palestinians.

101.    Ms. Robinson has long posted her social and political views on her social media platforms. She has posted about the Black Lives Matter movement, the Iraq war, abortion rights, and more.

102.    Like Ms. Robinson, other employees have also regularly expressed opinions about various political and social matters on the same social media platforms.

---

[3] CAIR, *CAIR Welcomes Maryland Union's Support for Teachers Punished for Pro-Palestine Views,* Dec. 26, 2023. https://www.cair.com/press_releases/cair-welcomes-maryland-unions-support-for-teachers-punished-for-pro-palestine-views/.

103.     Neither Ms. Robinson nor any of these employees had ever been disciplined for non-Palestine political speech on their social media. Ms. Robinson was disciplined, however, when she posted about Israel-Palestine.

104.     On December 29, MCPS' then CEO Brian Hull emailed MCPS staff and reminded them to align with the school system's values, even in their private lives and when on social media.

105.     MCPS administration further reminded staff not to post social media content that violates the Board of Education's policy or MCPS regulations, and that such conduct may be subject to progressive discipline.

106.     Approximately one month after Ms. Robinson was suspended, on January 5, Ms. Robinson attended an investigative meeting with her union representative.

107.     During the meeting, investigator Cheesebrough questioned Ms. Robinson about documents inside an approximately 50-page file, which they provided to Ms. Robinson during the meeting.

108.     They did not provide her an opportunity prior to the meeting to review the allegations against her and prepare with her union representatives or attorneys.

109.     Investigator Cheesebrough began showing Ms. Robinson newspaper articles, which she placed in a section of the packet titled, "impact on the community." They included a Washington Post article which depicted photos of a rally in Montgomery County protesting the County's actions toward employees with pro-Palestine views.

110.     Investigator Cheesebrough also questioned Ms. Robinson about her social media posts on her personal accounts, including the Angela Davis quote, *the world is watching*

post, the Cornell West video, the meme of Israel destroying the world in its search for Hamas, a photo of her own son wearing a keffiyeh 15 years ago, and other posts.

111.     Investigator Cheesebrough pointed out that the Star of David was depicted on the missile in one of her posts, to which Ms. Robinson explained that she believed it to be the Israeli flag. She explained that she would have shared the same post had it depicted a U.S. flag on the missile.

112.     Investigator Cheesebrough repeatedly asked Ms. Robinson about the "one-sidedness" and "unbalanced" approach of her personal social media posts, including showing Ms. Robinson an article which deemed Cornel West to be a problematic figure.

113.     Ms. Robinson explained during her investigation meeting that she was coming from a place of compassion, that never had the world seen real time images as horrific as those coming out of Gaza.

114.     She further emphasized that none of her posts had mentioned the culture or faith of any particular group, and that she had never shared her personal social media posts in the classroom, nor discussed the genocide in Gaza.

115.     Ms. Robinson and her representative attended a *Loudermill* hearing on January 29. Ms. Robinson's union representative read a statement on her behalf.

116.     Ms. Robinson received a *Loudermill* notice, dated January 25, which concluded that there was a preponderance of the evidence to determine that Ms. Robinson violated various MCPS policies related to discrimination, the code of conduct, social media, curriculum, and participation in political campaigns.

117.     On January 30, Ms. Robinson received an investigative report in which allegations against her that she engaged in what it referred to as "Inappropriate and

Unprofessional Social Media Posts" were sustained. The report was dated January 23, a week prior to her *Loudermill* hearing.

118.　The report included, among other things, complaints from parents about her social media, but it did not include any of the letters of support Ms. Robinson's colleagues and the MCPS community had sent to MCPS officials or the MCBOE.

119.　To Date, Ms. Robinson remains suspended.

<u>**Plaintiff Angela Wolf**</u>

**MCPS suspended Ms. Wolf, a qualified career educator who used her personal social media account to oppose the genocide in Gaza.**

120.　Ms. Angela Wolf is a teacher at Takoma Park Middle School ("TPMS") in Montgomery County, Maryland. She has been an educator for approximately thirty years. She currently serves as the Department Chairperson for English Language Development.

121.　Ms. Wolf is a long-time social justice activist. For example, she has protested neo-Nazi groups in Charlottesville, VA. She organized with others to oppose apartheid in South Africa. She has raised awareness about climate-change. She has also volunteered in different capacities, including translating and interpreting for those seeking asylum, and teaching for the United States Peace Corps.

122.　Ms. Wolf and her colleagues have expressed various opinions about different social and political causes, including immigrant rights, Ukraine, and Black Lives Matter.

123.　As a matter of conscience, Ms. Wolf opposes what she views as an unfolding genocide in Gaza and speaks out against it.

124.　On November 30, 2023, according to Ms. Wolf's investigative report, Resource Counselor Pamela Lever received a text through Remind (an MCPS approved app to communicate with parents) from a parent who learned about Ms. Wolf's personal Facebook

posts through an MCPS Jewish parents' group. The parent, who was anonymous, provided Counselor Lever with four of Ms. Wolf's personal Facebook posts.

125.     When asked about whether Ms. Wolf's posts violate MCPS policy, according to the report, Counselor Lever told the parent, "[t]here is a fine line of what teachers can post online in terms of politics."

126.     Resource Counselor Pamela Lever met with Principal Erin Martin and assistant Principal Aaron Williams, according to the report, and told them that a parent had contacted the school about Ms. Wolf's personal Facebook posts. She forwarded him the email from the parent.

127.     Shortly after, according to the report, Principal Martin and some County employees received additional emails from parents and others about Ms. Wolf's personal Facebook posts.

128.     Principal Martin, according to the report, then spoke with the Director of Student Support and Well-being, Greg Edmundson, and Associate Superintendent Peter Moran. Director Edmundson and Associate Superintendent Moran instructed Principal Martin to notify Ms. Wolf and place her on administrative leave on Friday December 1.

129.     They further instructed Principal Martin, according to the report, to follow up with an electronic notification and tell Ms. Wolf that an HR representative would contact her the following day. Associate Superintendent Moran said he would convene a virtual meeting on November 30 at 6 pm to discuss information and next steps.

130.     Principal Martin called Ms. Wolf later that evening and told her about the concern regarding her personal Facebook posts and placed her on administrative leave for Friday, December 1. She further informed her that this would likely be their last

communication until the investigation was completed and asked her to be available for a call from HR on Friday.

131.     Ms. Wolf was given a letter which prohibited her from contacting MCPS staff, faculty, or students.

132.     On the evening of November 30, according to the report, Principal Martin met with Sean McGee, Associate Superintendent Peter Moran, and Director Edmundson. During their meeting, they discussed notifying the staff, the TPMS community, and providing student and staff emotional support on Friday. They also coordinated onsite support for Friday, December 1, and had them stationed in counseling for drop-in sessions.

133.     Further, according to the report, they generated a community letter which they provided to Communications, Student Welfare and Compliance, OSG, and the director and associate director for review. They sent the letter to staff and community on November 30 at 9 pm.

134.     The letter stated:

> "I am writing to you today, Thursday, November 30, to address a series of antisemitic online posts that appear to have been made by a staff member at our school…I was extremely saddened and disappointed by the contents of these posts and strongly condemn the views expressed as they do not align with our school's values of inclusivity, respect, and acceptance."

135.     According to the report, Principal Martin and Assistant Principal Williams texted Cluster Security Coordinator Aaron Carter and his supervisor Mary Whalen and asked that they provide support at 7:30 am on December 1 in anticipation of media presence regarding the incident.

136.    Following the notification that Defendants sent to parents, according to the report, the principal received additional emails from parents, MCPS staff, community members, media, and others around the country to express their opinions.

137.    That night according to the report, following MCPS' notification, a parent emailed several MCPS staff complaining that Ms. Wolf was posting antisemitic content. Principal Martin also received emails regarding anti-Palestinian racism and Islamophobia from parents with children at TPMS. They expressed their concerns that support for Palestinian rights was wrongfully being construed as antisemitic and asked to meet with administration to discuss the matter.

138.    According to the report, an emergency staff meeting was held on the morning of December 1, during which MCPS central office staff and TPMS administration answered staff questions. They also told staff that Systemwide Safety and Emergency Management would continue to provide support.

139.    Ms. Wolf also learned that Associate Superintendent Moran told staff that they were free to speak with the media about the incident.

140.    Following the meeting, TPMS received several emails from individuals and parents who criticized TPMS's administration's harmful conflation of criticism of the Israeli government with antisemitism. They explained the realities of the situation in Gaza and provided the death toll at that time (15,000 people, including at least 5,000 children within two months). They explained that Ms. Wolf's speech criticized the Israeli government (not Jews) and therefore, her speech was not antisemitic. They also explained that political statements are not hate speech.

141.     On December 15, the MCEA sent a letter to MCPS administration criticizing MCPS for their "abuse of power that demonstrates little regards for the employee's Constitutional rights and basic notions of fundamental fairness."[4]

**MCPS' investigation of Ms. Wolf focused on her personal social media posts.**

142.     On January 3, 2024, Ms. Wolf attended an investigative meeting with Ms. Gail Gottlieb, her MCEA representative, and MCPS DCI Investigators Amy Chesebrough and Claude 'Ted' Onley.

143.     During the investigative meeting, investigator Onley questioned Ms. Wolf about her Facebook account. Ms. Wolf explained that she does not identify herself as a teacher or employee of MCPS on her social media.

144.     Investigator Onley questioned Ms. Wolf about social media posts on her personal Facebook account.

145.     Among these posts, investigator Onley focused on a political cartoon posted by Ms. Wolf which depicts the neonatal intensive care unit in Al-Shifa hospital in Gaza being targeted by an Israeli tank.

146.     Investigator Onley also questioned her about a Facebook post she shared from another user in which the user supported the Dulles airport bus drivers who refused to transport pro-Israel protestors to a pro-Israel rally. Ms. Wolf explained that she was a former bus driver and felt closely connected to this event.

---

[4] CAIR, *CAIR Welcomes Maryland Union's Support for Teachers Punished for Pro-Palestine Views,* Dec. 26, 2023. https://www.cair.com/press_releases/cair-welcomes-maryland-unions-support-for-teachers-punished-for-pro-palestine-views/.

147.      Investigator Onley questioned Ms. Wolf about a post shared from another Facebook user. The post reads, "It is not a war– It Is a Slaughter Israel Determined To Make Gaza Uninhabitable."

148.      Investigator Onley also questioned Ms. Wolf about a Facebook post she shared on December 20, 2020 regarding complaints that wealthy Montgomery County citizens had not done enough to help families disproportionately impacted by the Covid-19 pandemic. Investigator Onley's line of question regarding the post appeared to be related to the fact that many of the individuals on the list were Jewish, but Ms. Wolf informed investigator Onley she was not aware of this. She had never mentioned or alluded to any particular faith group in her post, and recalled getting the list off of a Forbes list of the wealthiest people who live in the County.

149.      Investigator Onley also questioned Ms. Wolf about whether she attended a protest against the Board of Education and which individuals she spoke with at the protest. Ms. Wolf explained that she had attended the rally and stood on the sidewalk in adherence of the instruction she was given not to step on MCPS property while on leave.

150.      Ms. Wolf shared other posts, which investigator Onley did not question her about, such as a photo of a Jewish and Palestinian boy who appeared to be friends. Ms. Wolf also shared a political cartoon of Palestinian and Jewish families – a Jewish family can be seen holding a sign that says, "We are not Netanyahu," while the Palestinian family holds a sign, "We are not Hamas."

151.      Ms. Wolf later provided a written response to investigators Cheesebrough and Onley as well as MCPS officials which explained that she was known as a dedicated, thirty-year teaching veteran willing to work with any and all students. She explained that while

antisemitism does exist, she is not antisemitic, nor is she racist. She closed her statement by stating that we live in a multi-viewpoint society where dialogue and debate are more productive than condemnation and silencing.

152.     On January 26, Ms. Wolf received notice of her *Loudermill* hearing, which concluded that there was a preponderance of the evidence to determine that Ms. Wolf violated MCPS policies related to discrimination, the code of conduct, and social media.

153.     Ms. Wolf attended the *Loudermill* hearing on January 29 with her union representative.

154.     On or around February 2, Ms. Wolf received an investigative report which accused her of violating the MCPS Employee Code of Conduct and the *MCPS Social Media Best Practices for Employees*.

155.     It referenced numerous exhibits which were not previously provided to Ms. Wolf. It also did not include the numerous letters of support that community members sent on behalf of Ms. Wolf. Furthermore, the allegations had been "sustained" on January 22, days prior to when Ms. Wolf was expected to defend herself at a *Loudermill* hearing.

156.     To date, Ms. Wolf remains suspended.

## CLAIMS FOR RELIEF

### CLAIM I (Against all Defendants)
### UNCONSTITUTIONAL VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTIUTION
### (ALL PLAINTIFFS)

157.     Plaintiffs incorporate by reference all preceding paragraphs as set forth herein.

158.     § 1983 provides individuals the right to sue state governments, government employees, and others acting "under color of state law" for civil rights violations.

159.     The First Amendment to the United States Constitution provides that "Congress shall make no law…abridging the freedom of speech." The First Amendment applies to state and local governments under the Fourteenth Amendment to the United States Constitution.

160.     "The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses…*[M]andating* […] might silence dissent and distort the marketplace of ideas… The Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience." *Matal v. Tam*, 582 U.S. 218, 249 (2017). *See also Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 ("The Court's finding of viewpoint bias ended the matter" and "Viewpoint discrimination is a poison to free society.")

161.     Local governing bodies and local officials in their official capacities can be sued directly under § 1983 in situations where the action that is alleged to be unconstitutional implements or executes a policy or decision promulgated by those whose acts may fairly be said to represent official policy. *See Monell v. Department of Social Services of Cty. of New York*, 436 U.S. 658, 659 (1978).

162.     Defendants violate the First Amendment by:

a.  Enforcing the *Best Practices for Email* policy against Plaintiff El-Haggan by investigating and suspending her for including the slogan "From the river to the sea, Palestine will be free" in her email signature but not enforcing the policy against other employees of different

religions and ethnicities who engaged in the same conduct and used their email signatures to express other social and political views.

b.  Enforcing the *Social Media Best Practices* policy against Plaintiffs Robinson and Wolf by investigating and suspending them for posting social media content advocating for Palestinians suffering in Gaza, while not reprimanding them or their colleagues for their previous posts on various social and political issues.

163.    Plaintiffs' speech never once attacked members of a specific community. Plaintiffs' speech criticized the actions of a foreign government which was found to have committed human rights abuses against civilians. To date, at least 28,000 people have been killed in Israeli attacks. As many have said in their letters of support on behalf of plaintiffs, Defendants must not conflate criticism of the Israeli government with antisemitism. Plaintiffs' speech was also confined to private social media and to an email account used only by internal county staff; in all cases, no students interacted with Plaintiffs' speech. Plaintiffs' speech did not in any way impede their performance in the classroom. *See Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415 n.4 (1979); *Pickering v. Bd. Of Ed. Of Twp. High Sch. Dist.*, 391 U.S. 563, 572-73 (1968).

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form described in the Prayer for Relief below, plus all such other relief this Honorable Court deems just and proper, including costs and attorneys' fees incurred in this action.

## CLAIM II  (Against MCBOE)
## DISPARATE TREAMENT DISCRIMINATION ON THE BASIS OF ETHNICITY AND RELIGION IN VIOLATION OF TITLE VII
## (PLAINTIFF EL-HAGGAN ONLY)

164.    Plaintiff Hajur El-Haggan incorporates by reference paragraphs 22-46 as set forth herein.

165.     Defendant violated Title VII by treating Plaintiff El-Haggan differently than similarly situated employees because of her religion, race, color, and national origin.

166.     Defendant investigated and suspending Plaintiff El-Haggan for content in her email signature that was similar to those of her colleagues who did not share   Plaintiff El-Haggan's religion or ethnicity.

167.     Defendant did not investigate and place Plaintiff El-Haggan's colleagues on leave, despite the fact that they participated in similar conduct.

168.     Defendant's actions were based on discriminatory motive.

169.     Plaintiff El-Haggan was adversely impacted by Defendant's actions in that Plaintiff El-Haggan was investigating and suspended.

170.     The willful, intentional, and unlawful action violates the laws and regulations of the United States, including, without limitation, Section 701(j) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-(j) and 2000e-2(a), as amended.

171.     Defendant acted with malice and reckless indifference to Plaintiff El-Haggan's federally protected rights by disciplining her for conduct that it did not discipline her colleagues for, in violation of Title VII.

172.     As a result of Defendant's unlawful actions, Plaintiff El-Haggan has been removed from the classroom and cannot teach her students.

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form described in the Prayer for Relief below, plus all such other relief this Honorable Court deems just and proper, including costs and attorneys' fees incurred in this action.

**CLAIM III (Against MCBOE)**
**DISPARATE TREATMENT IN VIOLATION OF §20-602, ANNOTATED CODE OF MARYLAND**
**(PLAINTIFF EL-HAGGAN ONLY)**

173.       Plaintiff Hajur El-Haggan incorporates by reference paragraphs 22-46 and
136-144 as set forth herein.

174.       For the same reason that Defendant MCBOE violated Title VII, Defendant
violated §20-602 of the Md. Ann. Code.

WHEREFORE, Plaintiff requests this Honorable Court grant relief in the form
described in the Prayer for Relief below, plus all such other relief this Honorable Court
deems just and proper, including costs and attorneys' fees incurred in this action.

## Prayer for Relief

WHEREFORE, Plaintiffs request that this Honorable Court enter judgement in favor of
Plaintiff and against Defendants, on each and every count in this Complaint, and enter an
order awarding the following relief:

A.  Declare that Defendants violated the First Amendment by enforcing the *Best Practices
for Email* policy and the *Social Media Best Practices* policy against Plaintiff Hajur El-Haggan
and Plaintiffs Anike Robinson and Angela Wolf respectively because of the subject matter
and viewpoint of their speech;

B.  Declare that Defendants violated Title VII by enforcing a dormant policy, *Best
Practices for Email,* against Plaintiff Hajur El-Haggan rather than others who do not share
Ms. El-Haggan's ethnicity or religion but did the same kinds of things.

C.  Issue an injunction prohibiting Defendants from enforcing policies on the basis of
subject matter and viewpoint in violation of the First Amendment;

D.  Issue an injunction prohibiting Defendants from enforcing policies on the basis of
ethnicity and religion in violation of Title VII;

32

E.  Payment for all economic damages, including but not limited to, back pay, front pay, and lost benefits;

F.  Payment for non-economic damages, including emotional harm;

G.  Punitive damages;

H.  Statutory damages;

I.  An award of attorneys' fees, costs, and expenses of all litigation; and,

J.  Any further relief to which Plaintiff is entitled or that this honorable Court deems just and proper.

## Jury Demand

Plaintiffs demand a trial by jury of the above-referenced causes of action.

Respectfully Submitted,

**CAIR LEGAL DEFENSE FUND**

_____/s/ Lena F. Masri_____

Lena F. Masri (20251)_

lmasri@cair.com

Gadeir I. Abbas* (20257)

gabbas@cair.com
Zanah Ghalawanji (30743)
zghalawanji@cair.com
Rawda Fawaz**
rfawaz@cair.com
453 New Jersey Ave SE
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 379-3317

*Licensed in VA, not DC.
Practice limited to federal matters.

** Pro Hac Vice Forthcoming

Attorneys for Plaintiffs.

Date: February 14, 2024